IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 11-cv-00755-RBJ

MARITZA PAGAN

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

      Defendant.

---

## AMENDED ORDER

---

    This matter is before the Court on review of the Commissioner's decision denying plaintiff Maritza Pagan's application for Social Security benefits under Title II and Title XVI of the Social Security Act.  Jurisdiction is proper under 42 U.S.C. § 405(g).  This dispute became ripe for decision by this Court upon the filing of plaintiff's Reply Brief on September 2, 2011. The Court apologizes to the parties for the delay in resolving the case.

    **Standard of Review**

    This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the District Court is to examine the record and determine whether it "contains substantial evidence to support the Secretary's decision and whether the Secretary applied the correct legal standards."  *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998).  A decision cannot be based on substantial evidence if "it is overwhelmed by other evidence in the record. . . ."  *Bernal v. Bowen,* 851 F.2d 297, 299 (10th

Cir. 1988).  Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2007).  Evidence is not substantial if it is "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

**Facts**

Maritza Pagan, age 35, is a physically healthy young woman, but she has dealt with mental health issues dating back to suicidal ideation and one suicide attempt as a teenager.  R. 383.  She was a poor student in high school, but she went to college, did better, and ultimately earned an Associate of Arts degree in Business Management.  R. 384.

In 2006, while attending Metropolitan State College of Denver, Ms. Pagan received individual and group counseling for problems associated with bipolar disorder from a school psychologist, Mollie Hill, Ph.D.  R. 396.  She was having difficulties in her classes, and Dr. Hill referred her to the school's access center with a request that Ms. Pagan be given assistance with academic accommodations.  *Id.*  That apparently led to a referral to the State of Colorado Department of Human Services, Division of Vocational Rehabilitation.  There she was seen by Grace Wong, M.D., a psychiatrist on May 9, 16 and 23, 2006.  Dr. Wong diagnosed "bipolar affective disorder NOS" and recommended that she receive certain medications and individual psychiatric therapy.  R. 388.  In a Mental Health Report dated June 1, 2006 Dr. Wong reported, as the reasons Ms. Pagan was in treatment, "mood swings, anger outbursts, depressed, anxious, violent behavior intermittently, excessive irritability and variable motivation."  R. 386.  However, she also expressed the opinion that Ms. Pagan could engage in clerical work, indicating that she is intelligent and has good concentration generally.  R. 387.

The Division of Vocational Rehabilitation also requested a comprehensive psychiatric evaluation of Ms. Pagan from Marita J. Keeling, M.D.  Dr. Keeling saw her on August 15 and

24, 2006. Dr. Keeling diagnosed "Bipolar Disorder, Type I, mixed" and recommended resumption of Seroquel and Lamictal. R. 385. Dr. Keeling saw Ms. Pagan again on September 20, 2006 and noted that she was improved but still cycling and unstable in mood. R. 381. Ms. Pagan was working in telemarketing, and Dr. Keeling reported that she felt the job was going better, but that she wanted to do something else. She was anticipating a job interview as an administrative assistant. *Id.*

On September 26, 2006 Ms. Pagan self-referred to the Aurora Mental Health Center. She was seen by Deborah Casuto, Psy.D, whose intake report noted her prior diagnosis of bipolar disorder but suggested that the mood fluctuations might have been triggered by trauma memories. R. 497. This report described Ms. Pagan as bright, articulate, and a good candidate for therapy. *Id.* It concluded with a diagnosis of Axis I: Mood Disorder, NOS; and Axis I (Secondary): Rule out Bipolar Disorder, PTSD. R. 499.

She was seen at the Aurora Mental Health Center for a medication evaluation on October 2, 2006 by Leslie Winter, M.D, a psychiatrist. This report indicates that she had been fired from her job, was worried about paying rent, and was feeling angry, sad and depressed. R. 490, 492, 493. Various medication changes were recommended. On October 10, 2006 Dr. Casuto reported that Ms. Pagan had been fired from her job because of her "attitude." R. 489. Ms. Pagan reported having been fired from many jobs due to attitude problems and rudeness towards customers. *Id.*

On October 17, 2006 Dr. Keeling reported that Ms. Pagan had decided to continue treatment with the Aurora Mental Health Center and also noted that she had gotten a new telemarketing job. R. 380. However, on October 23, 2006 Dr. Casuto saw Ms. Keeling who reported that she had been reprimanded at work because she was "blowing off steam" by yelling,

pounding and stomping in the employee bathroom.  R. 488.  On November 6, 2006 Ms. Pagan reported to Dr. Casuto that she had quit her job after having a conflict with her supervisor.  R. 485.  On November 16, 2006 Ms. Pagan reported to Dr. Casuto that she was very frustrated in her search for a new job.  R. 484.  Her sessions with Dr. Casuto or others at the Aurora Mental Health Center continued during 2007.  R. 400-83.

Although her employment status during this time is not entirely clear, I note that she called on May 23, 2007 to report that she would no longer be attending "DBT group" due to a conflict with her work schedule.  R. 447.  She received vocational coaching at the Center on June 20, 2007 regarding complaints from her supervisor about her anger issues.  R. 441-42.  On July 13, 2007 she reported that she had been moved to a different schedule at work due to complaints from co-workers about her attitude, and she felt the new schedule was working better.  R. 438.  She received additional job coaching that day, R. 432-37, and again on July 19, 2007.  R. 429-30.

The Center's record of her session on August 14, 2007 indicates that she reported that she was exercising approximately once per week, and that she "says new job requires much activity." R. 428.  However, on August 31, 2007 she reported that "her job at the VA ended two weeks ago and that it ended on a bad note."  R. 422.  She said that she had a hard time getting along with other people at her job, and that she had been unable to say at a job for more than three months in over one year.  The therapist discussed Ms. Pagan's possibly applying for Social Security benefits and referred her to "CLP" for assistance with that.  *Id.*  She received more vocational assistance on September 5, 7, 10 and 11, 2007.  R. 413, 415, 417, 418.  On September 11, 2007 the Center's report notes that she needs help applying for SSI benefits.  R. 414.  On October 8, 2007 the Center provided her with documentation to take to an appointment at the Social Security Administration the next day.  R. 404.

On or about October 9, 2007 Ms. Pagan submitted a claim for Social Security and Supplemental Security Income ("SSI") benefits. R. 313. She indicated that her ability to work was limited by bipolar disorder, mood disorder, and post-traumatic stress disorder. R. 318. She told the interviewer that her condition first bothered her in 2005, but that she had continued to work until August 16, 2007 (apparently the date she lost her job at the VA). The interviewer recommended that Ms. Pagan claim a disability onset date of August 16, 2007. *Id.*

On October 18, 2007 Ms. Pagan completed a work history report. R. 325-31. This listed jobs dating back to 1997, reflecting jobs in fast foods, child care, various clerical positions, bank teller, and telemarketing. R. 325. The duration of these jobs ranged from one month (as a night auditor for motel in 2003) to 21 months (as a student assistant at Metro State College from August 2004 to May 2006). Her most recent job reported on this form was as a telemarketer from June through September 2006. *Id.*

Ms. Pagan also completed a function report on October 18, 2007. R. 332-339. She described her daily activities as attending to personal hygiene, eating breakfast, reading the Bible, praying, if working going to work, if not working doing household chores, shopping (biweekly), eating lunch, napping, eating dinner, watching television until 10:00 p.m., reading the Bible, praying, and going to bed. R. 332, 334, 335. She indicated that she had difficulty staying at a job for longer than three months, and that she has a fear, distrust and resentment of persons in authority such as bosses. R. 333, 338.

In November 2007 a "Mental Residual Functional Capacity Assessment was prepared by Mark Suyeishi, Psy.D., based upon his review of medical records. R. 362-65. In this assessment, dated November 28, 2007, Dr. Suyeishi concluded: "claimant can follow simple instructions, sustain ordinary routines and make simple work related decisions; cannot work

closely with supervisors or coworkers; can accept supervision and related to coworkers if contact is not frequent or prolonged." R. 364.  In a separate document, entitled "Psychiatric Review Technique, R. 366-79, Dr. Suyeishi provided his own summary of her mental health history, likewise based on a record review.  R. 378.  A vocational specialist, apparently basing his or her conclusions to a large extent on Dr. Suyeishi's reports, concluded in a report dated November 28, 2007 that Ms. Pagan had no physical limitations, but with respect to mental limitations stated: Capable of unskilled work, less contact."  R. 340.

Meanwhile Ms. Pagan continued to be seen at the Aurora Mental Health Center for mental health and vocation issues.  .A progress note of November 20, 2007 by Karyn Kalsenes, M.D., indicates that Ms. Pagan reported that rage episodes were less intent and frequent, and that she was employing coping skills.  R. 666.

On November 28, 2007 Nancy Berryhill, Social Security Administration Regional Commission, advised Ms. Pagan that her disability claim had been denied.  Based upon a review of reports from the Aurora Mental Health Center, University of Colorado Hospital Psychiatric Services, Aurora Vocational Rehabilitation, the University of Colorado Hospital, and Ms. Pagan, the regional office found that she had "a bipolar mood disorder and need to rule out PTSD."  R. 87.  However, the office found that her condition "does not cause severe limitations of your daily activities [or] your ability to made decisions or to relate with others," and it concluded that "[y]ou should be capable of performing work."  *Id.*

On January 23, 2008 Ms. Pagan requested a hearing by Administrative Law Judge ("ALJ").  R. 91.  The hearing was held approximately 18 months later.  Between the denial of her claim on November 28, 2007 and the hearing she continued to see various professionals at

the Aurora Mental Health Center for mental health and vocational issues.  *See generally* R. 625-708.

Whether and to what extent she might have been working during that period is not entirely clear.  A March 4, 2009 note indicates that the Center was continuing to work on her vocational skills building.  R. 557.  More "job coaching was provided later that month.  R. 558, 562.  She apparently was working somewhere that time, because an entry in these records for March 31, 2009 indicates that she told Marianne Webb, a clinical nurse specialist, that Ms. Pagan was "more irritable due to frustration with job and limits set there."  R. 554.  Nurse Webb also noted areas of improvement.  R. 646-55, 657-59.

Between June and July 2009, Ms. Pagan reported to her therapists that she was "much calmer," "much happier," and had been getting very good sleep with her current combination of five medications.  R. 674-96.  Her therapist at the Aurora Mental Health Center, Karen Levine, LPC, stated that she was "feeling much more hopeful about life and has already noticed an improvement in her attitude."  She encouraged Ms. Pagan to consider getting less treatment from the mental health center and assessed her with a "stable" mood and a "pleasant and cooperative" affect.  R. 697.

However, on July 13, 2009, shortly before the ALJ hearing, Ms. Levine completed another vocational report.  R. 507-08.  She check boxes on the form to indicate that Ms. Pagan had "marked" limitations in interacting appropriately with the public, supervisors, and coworkers, and in responding appropriately to usual work situations and changes in routine; "moderate" limitations in her ability to make judgments on complex work-related decisions; "mild" limitations in her ability to make judgments on simple work-related decisions and to understand and remember complex instructions; and no limitations in her ability to understand,

remember and carry out simple instructions." *Id.*   She added that that Ms. Pagan had had

"multiple attempts in a variety of work settings," resulting in a failure to "successfully maintain

employment," and that Ms. Pagan "frequently interact[ed] negatively with staff and in group

therapy." R. 508.

The ALJ hearing began on July 30, 2009 before Judge Blaine L. Boyens, but no

testimony was taken that day.  The ALJ had Ms. Pagan's medical records, apparently including

recent records from Mr. Levine.  R. 31-35.  An attempt to continue the hearing on September 21,

2009 failed, because the scheduled witness, Robert Pelc, M.D, a psychologist, had not received

all of the pertinent medical records.  The hearing finally proceeded on November 12, 2009.  The

medical records available to the ALJ were apparently updated through August 2009.  R. 56.  Dr.

Pelc's testimony was not taken, for reasons unknown to this Court.  The only witnesses were Ms.

Pagan and a vocational consultant.

Ms. Pagan testified that she was living alone in a studio apartment.  R. 58.  She

confirmed that she could take care of the apartment and attend to her own personal care.  *Id.*  She

does her own laundry, cooking, and grocery shopping.  R.60.  She had a driver's license and

could drive but did not have a car.  *Id.*  She confirmed that she had a high school diploma, an

Associate of Arts degree, and two additional years of college, but no B.A. degree.  R. 61.  She

testified that she was last employed on March 30, 2009, a 20-hour a week minimum wage job

doing clerical work.  R. 61-62.  She indicated that she would be moving because she had

received a Section 8 voucher.  R. 63.

She described typical daily activities, which included job hunting.  R. 63-64.  She was

looking for employment as an office clerk or in day care, and she indicated that she hoped to go

back to school to assist in obtaining a career working with children or animals.  R. 64-65, 68-69.

She indicated that stress and difficulty working around people and supervisors had interfered with jobs, and that job hunting was a challenge, but that "[i]t has gotten a lot better . . . thanks to Aurora Mental Health." R. 65. She said that taking instructions remains a primary problem if she does not have a "decent employer," but working around other people was no longer an issue. R. 66. She claimed to have a healthy social life including a 12-step support group through her church and other church activities. R. 66-68. She attended twice monthly sessions at the Aurora Center for Mental Health for mood and depression. Her therapist was Ms. Levine, and she also was seeing a psychiatric clinical nurse specialist, Ms. Webb, every three months for evaluation of her medications. R. 69-72. She described the Center's programs and efforts to provide vocational assistance, but she acknowledged that the efforts had not been successful. R. 72-73, 75-76.

A vocational consultant, Robert Schmidt, whose qualifications were stipulated, testified that he had reviewed the records received from the Office of Disability Adjudication and Review. R. 76. He also posed questions to Ms. Pagan. R. 77. He agreed with the ALJ that Ms. Pagan's past jobs did not have earnings sufficient to qualify as substantial gainful activity. R. 78-79. He also indicated that, with her limitations ("cannot work closely with supervisors and coworkers, other than to accept supervision and relate to coworkers if the contact is infrequent and not prolonged"), she could not handle telemarketing. R. 80. However, he expressed the opinion that Ms. Pagan could perform the position of housekeeping/cleaner, of which there were 13,000 jobs in Colorado and 2,800,000 jobs nationally. *Id.* He gave the example of maid service in a motel. *Id.* She could also work as a production assembler, with 10,000 jobs in Colorado, 1,500,000 nationally. R. 81.

The ALJ issued a written decision on November 25, 2009, concluding that "the claimant has not been under a disability within the meaning of the Social Security Act from August 16, 2007 through the date of this decision." R. 15.  The ALJ followed the regulatory five-step evaluation process to determine if Ms. Stewart is disabled.  *See* 20 C.F.R. § 404.1520(a)(4).  At step one he found that, despite her work in 2009, Ms. Pagan's earnings were such that she had not engaged in substantial gainful activity since August 16, 2007.  *Id.*  At step two he found that Ms. Pagan has severe impairments, i.e., a mood disorder, PTSD and a bipolar disorder.  *Id.*

However, at step three, the ALJ found that Ms. Pagan's impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Mental disorders are listed at section 12 of Appendix 1.  Within that category, affective disorders are listed in section 12.04.  To satisfy severity requirements, section 12.04 paragraphs A and B, or paragraph C, must be met.  Paragraph A lists mood disorders including depressive and bipolar syndromes.  Paragraph B requires two or more of (1) marked restriction of activities of daily living, (2) marked difficulties in social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; and (4) repeated episodes of decompensation, each of extended duration.  Paragraph C requires a medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of the ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and including at least one of (1) repeated episodes of decomposition, (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change to the environment would be predicted to cause the individual to decompensate, or (3) a current history of one or more years' inability to function

outside a highly supportive living arrangement, with an indication of a continued need for such an arrangement.

The ALJ cited Dr. Suyeishi's opinion that Ms. Pagan did not meet either paragraph B or C criteria and found that, although he was not a treating physician and had not examined her, a state agency psychological consultant's findings must be considered and may be entitled to significant weight. R. 18. The ALJ found that the medical evidence supported Dr. Suyeishi's opinions. The evidence showed that (1) Ms. Pagan's impairments had little effect on her ability to perform daily activities; (2) that her testimony and her global assessment functioning scores at the Aurora Center for Mental Health showed no more than moderate impairment of her social functioning; (3) that Dr. Wong had found that she was intelligent and had good concentration generally; (4) that Ms. Levine had noted that Ms. Pagan's impairments had either no or mild impact on her concentration and pace; (5) that Dr. Suyeishi had determined that her ability to concentrate and to understand and carry out job instructions was only moderately impaired; and (6) there was no evidence of a decompensation episode. R. 18-19.

Before moving to steps four and five, the ALJ discussed Ms. Pagan's residual functioning capacity at some length. R. 19-22. He found that she had a history of depression, anxiety and problems with anger management and social interaction. *Id.* at 19-20. He noted Dr. Keeling's diagnosis of a bipolar disorder but that she was showing improvement on Lamictal when she last saw Ms. Pagan in September 2006. *Id.* at 20. The ALJ noted Ms. Pagan's presentation to an emergency room in June 2007 with a determination that she was anxious but with a stable affect, logical and coherent thought processes, and basically intact memory and concentration. *Id.*

The ALJ reviewed Ms. Pagan's mental health treatment at the Aurora Center for Mental Health since September 2006 with diagnoses of a bipolar disorder, a mood disorder, and PTSD

with periods of depression, irritability, rage, anger and intense frustration. *Id.* However, these records also revealed participation in therapy and better control of anger and rage episodes. *Id.* He traced her progress during the 2008-09 period (post denial of her social security claim in November 2007), with comments by professionals at the Center that she still struggled with anxiety, but that her mood had improved, she was only mildly anxious, and that she self-reported feeling better and doing well. *Id.* He noted in particular comments from Ms. Levine that Ms. Pagan was making progress, and that her rage episodes were diminishing. *Id.* In April 2009 a clinician at the Center had written a letter of recommendation indicating that Ms. Pagan was professional, had good verbal and written skills, and could work independently. *Id.* at 21. It was also noted more generally that in 2009, despite frustrations at work, Ms. Pagan could calm herself without much difficulty, had good insight into her anger and rage, had a stable mood, and "appears more baseline." *Id.* at 20-21. She experienced problems secondary to the loss of her job in May 2009, but her mood stabilized, and Ms. Levine suggested that she should consider decreasing her treatment. *Id.* at 21. In August 2009 Nurse Webb reported that Ms. Pagan was more positive, and that her irritability had decreased considerably. *Id.*

The ALJ noted that throughout these records her global assessment functioning or "GAF" scores were generally 52-60, most recently 61, indicating a moderate psychological impairment in social and occupational functioning. *Id.*

However, the ALJ also noted that in July 2009 Ms. Levine had completed a mental functional capacity assessment in which she opined that Ms. Pagan had marked impairment in interacting appropriately with co-workers, supervisors and the general public, and in responding to work situations. *Id.* The ALJ indicated that he would find Ms. Pagan to be disabled if he gave Ms. Levine's assessment significant weight. However, he did not accept the assessment because

(1) a licensed practical counselor is not an "acceptable" medical source under the regulations; (2) her opinion was entitled to consideration but less weight than that of a psychiatrist or psychologist; (3) Ms. Levine did not identify medical evidence or examination findings to support the restrictions she assessed; (4) treatment records generally reflected improvement in Ms. Pagan's symptoms and functioning; (5) the GAF scores indicated only mild to moderate restrictions in social and occupational functioning.; (6) Ms. Levine had commented on the negative way that Ms. Pagan interacts with staff and in group therapy, whereas therapy records documented her active participation in group sessions and that she interacted well with the group. *Id.* at 21-22.  In contrast, the ALJ gave significant weight to Dr. Suyeishi's assessment based upon his being a psychologist, his thorough review of the records, and the ALJ's finding that his opinions were well supported by and consistent with the record. *Id.* at 22.

With respect to step four of the five-step analysis (does the claimant have the residual functioning capacity to perform the requirements of past relevant work), the ALJ found that her past work as a telemarketer was the only job which met the statutory definition of past relevant work, and that because she is "basically limited to unskilled work," she could not perform her past relevant work.  R. 22.

Finally as to step five (whether the claimant is able to do any other work considering her residual functioning capacity, age, education and work experience), the ALJ found that there are jobs that exist in significant numbers that Ms. Pagan can perform.  He cited the vocational expert's opinion regarding her ability to do housecleaning and production assembly work.  R.23. He found that, considering Ms. Pagan's young age, her education, her work experience, and her residual functional capacity, she was capable of making a successful adjustment to that type of

work.  Therefore, he found, she was not disabled within the meaning of the Social Security Act.

R. 23-24.

The SSA Appeals Council denied Ms. Pagan's request for review of the ALJ's decision,

thus making that decision a final and appealable order.  R. 1-3.  This appeal was filed on March

25, 2011.

**Conclusions**

To be eligible for benefits Ms. Pagan must be disabled, meaning that her mental

impairment is of such severity that she "is not only unable to do [her] previous work but cannot,

considering [her] age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  Counsel for Ms.

Pagan begins her argument with the ALJ's statement that Ms. Levine's opinion would result in a

finding of disability if it were given great weight.  Opening Brief [#13] at 3.  Without necessarily

agreeing with that statement, I accept it for present purposes.

Ms. Pagan's argument focuses on her disagreement with the ALJ's decision to give the

opinions of Ms. Levine, a licensed professional counselor who had considerable recent contact

with Ms. Pagan, less weight than the opinions of Dr. Suyeishi, a psychologist whose opinions

were based solely on his review of medical records through November 2007.  She argues that the

ALJ failed to follow the correct legal standard for weighing medical evidence, because he did not

evaluate Ms. Levine opinions using the 20 C.F.R. § 404.1527(d) factors.  I disagree.

Social Security Ruling 06-03p establishes the Administration's policies with respect to

information from "other sources."  The ALJ is permitted but not required to use the 20 C.F.R. §

404.1527(d) criteria to evaluate medical opinions from sources who are not "acceptable medical

sources."  SSR 06-03p at *4 (the 20 C.F.R. § 404.1527(d) factors "can be applied to opinion

evidence from 'other sources.'"").   Nor was the ALJ required expressly to apply each §

404.1527(d) factor.  *See Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007).   What is

paramount is that the ALJ either explain the weight given to "other source" opinions or

"otherwise ensure that the discussion of the evidence in the determination or decision allows a

claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may

have an effect on the outcome of the case."  *Id*. at *6.

Here the ALJ did provide reasons for discounting Ms. Levine's July 2009 opinion in

comparison to that of Dr. Suyeishi:

- A licensed practical counselor is not an "acceptable medical source" under the
  regulations.  That is undisputed.  That does not mean that her opinions were not
  entitled to consideration.  The record shows that the ALJ did consider Ms. Levine's
  opinions, specifically including her July 2009 assessment.  However, for reasons
  expressed, he disagreed with that assessment.  R.21.

- The opinion of an "acceptable medical source" is generally entitled to greater weight
  than that of another source.  That general proposition is beyond dispute.  The ALJ
  found that Dr. Suyeishi, who was an "acceptable medical source," based his opinions
  on a "thorough" review of the records that existed at the time of his evaluation.  This
  is undisputed in the record.  Dr. Suyeishi found that Ms. Pagan has "a mental residual
  functional capacity for simple work tasks with ordinary routines and interaction with
  co-workers and supervisors which was not frequent or prolonged."  The ALJ found
  that those opinions were well supported by and consistent with the record.  R. 22.
  Based upon my review of the entire record, including Ms. Pagan's own testimony, I
  agree.

- Ms. Levine did not identify medical evidence or examination findings to support the restrictions she assessed.  R. 21.

- The treatment records generally reflected improvement in Ms. Pagan's symptoms and functioning.  *Id.*  I agree and find that this proposition is all but indisputable.

- The GAF scores generally ranged from 52 to 61 which indicated only mild to moderate restrictions in social and occupational functioning.  Ms. Pagan points out that there are four reports of GAF scores below 52.  On the other hand, the Commission points out that Ms. Pagan had 12 scores in the 52-61 range and two scores above 61.  Response Brief [#14] at 6 n.4.  Overall, the ALJ's characterization of the general range of the scores was accurate.  His interpretation of what scores in that general range indicate has not been refuted.

- Ms. Levine had commented on the negative way that Ms. Pagan interacts with staff and in group therapy.  However, the ALJ found, and my review confirms, that the records document her active participation in group sessions and that she generally interacted well with the group.  *Id.* at 22.

One must bear in mind that the role of this Court is not to conduct a de novo review. Rather, as indicated above, the role of this Court is to examine the record and determine whether it "contains substantial evidence to support the Secretary's decision and whether the Secretary applied the correct legal standards."  *Rickets,* 16 F.Supp.2d 1280 at 1287.  *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990).  Nevertheless, after initially glancing at the briefs and noting that they largely focused on disagreements about facts and evidence in the record, I conducted my own review of the record before reading the substance of the parties' respective arguments.  The Court's review of the facts supported by the record is contained in this order.

The record plainly shows that Ms. Pagan's employment history is dotted with terminations based on her inability to get along with supervisors and co-workers. There is no question but that these issues are related to her mental health. The ALJ was well aware of that history. By the same token, the record reflects an intelligent young woman of good physical health who, to her credit, wishes to work. She has received therapy and medications to help her cope with her mental health issues, particularly in recent years from the Aurora Mental Health Center and has improved. This improvement has been noted not only by Ms. Pagan herself (see below) but by Dr. Kalsenes and Nurse Webb. She has also received substantial vocational counseling, and I found nothing in the record indicating that it has not been helpful.

Plaintiff largely ignores Ms. Pagan's own testimony before the ALJ. That testimony reflects an individual who is fully capable of living alone, is handling her daily activities, and is actively engaged in job hunting. She has aspirations to continue her college education and has specific ideas of the types of work she would like to do. She acknowledges past difficulties with supervisors and working around people, but also said that she has improved in those areas because of the assistance she received at the Center. She no longer thinks she'll have a problem working around people, and she does not believe taking instructions from supervisors will still be a problem if her employer is "decent." She is, or at least was at the time of the hearing, continuing to receive therapy and medication reviews from the Center.

Significantly, despite this positive evidence, the ALJ found that Ms. Pagan's mental issues are such that she cannot do her past relevant work, even including telemarketing. However, based on a hypothetical that posited that Ms. Pagan "cannot work closely with supervisors and coworkers, other than to accept supervision and relate to coworkers if the contact is infrequent and not prolonged," the vocational consultant Mr. Schmidt presented unrefuted

17

testimony that Ms. Pagan can perform housecleaning work and production assembly work. These are positions that do not appear to require substantial interaction with the public, co-workers or supervisors.  Statistically, there are many such jobs in Colorado.

There is no evidence in the record that Ms. Pagan is incapable of either type of job.  The vocational expert's opinion and ultimately the ALJ's finding are consistent with Dr. Suyeishi's opinion.  They are consistent with the November 2007 assessment of a different vocational expert based on Dr. Suyeishi's opinion.  There is support in the record for these findings going all the way back to Dr. Grace Wong's assessment in 2006.  In fact, this type of work does not appear necessarily to be inconsistent with Ms. Levine's July 2009 assessment.

One could come to a different conclusion on this record.  However, that "does not prevent an administrative agency's findings from being supported by substantial evidence." *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004).  Courts cannot "reweigh the evidence nor substitute [their] judgment for that of the agency."  *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001)(citations omitted).  The Court recognizes that Ms. Pagan faces challenges and wishes her well.  However, the Court concludes that the ALJ's findings and conclusions are supported by substantial evidence.

**Order**

For these reasons, the decision of the agency is affirmed.

DATED this 22nd day of August, 2012, npt to June 26, 2012.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge

18